_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

★      MAY 2 4 2006      ★

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

MAY 2 4 2006

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

06-CV-00726-RCPT

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

WASHINGTON ASSOCIATION OF CHURCHES, as
an organization and representative of its members;
WASHINGTON ASSOCIATION OF COMMUNITY
ORGANIZATIONS FOR REFORM NOW (ACORN),
as an organization and representative of its clients;
ORGANIZATION OF CHINESE-AMERICANS --
GREATER SEATTLE CHAPTER, as an organization
and representative of its members; CHINESE
INFORMATION & SERVICE CENTER, as an
organization and representative of its clients; FILIPINO
AMERICAN POLITICAL ACTION GROUP OF
WASHINGTON, as an organization and representative
of its members; KOREAN AMERICAN VOTERS
ALLIANCE, as an organization and representative of
its members; SERVICE EMPLOYEES
INTERNATIONAL UNION (SEIU) – LOCAL 775, as
an organization and representative of its members; and
WASHINGTON CITIZEN ACTION, as an
organization and representative of its members,

                         Plaintiffs,

        v.

SAM REED, in his official capacity as Secretary of
State for the State of Washington,

                         Defendant.

Civil No. 06-0726 RSM

**PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION**

**NOTE ON MOTION**
**CALENDAR: June 9, 2006**

**ORAL ARGUMENT**
**REQUESTED**

_Pl. Mot. for Prelim. Injunction (CV 06-0726)_

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

## ORIGINAL

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ..................................................................................................2

    A.   Washington's New "Matching" Statute...................................................2

    B.   Overview of the "Matching" Process ......................................................3

    C.   The Sources of Error:  Entering, Maintaining, and "Matching"
        the Data...............................................................................................4

        1.    Entering the Data .................................................................5

        2.    Maintaining, Storing, Transferring, and Transforming the Data......5

        3.    "Matching" the Data .............................................................5

        4.    The Disproportionate Effect of "Matching" .............................6

        5.    The Unacceptable Error Rates.................................................7

    D.   The Inadequacy of Follow-Up ..............................................................8

    E.   The Irreparable Harm to Plaintiffs.........................................................9

ARGUMENT ..................................................................................................................10

  I.   Plaintiffs Have Shown a Strong Likelihood of Success on the Merits on
      Their Federal Statutory Claims ............................................................10

    A.   RCW 29A.08.107 Conflicts with and Violates HAVA.............................12

        1.    RCW 29A.08.107 Obstructs the Goals of Congress in Enacting
           HAVA's Computerized Statewide Registration List Provision.....13

        2.    RCW 29A.08.107 Makes It Impossible for Washington to
           Comply with HAVA's Identification Provisions......................15

        3.    RCW 29A.08.107 Also Makes It Impossible for Washington to
           Comply with HAVA's "Fail-Safe" Provisional Ballot Provision ...15

    B.   RCW 29A.08.107 Conflicts with and Violates the Voting
        Rights Act .........................................................................................16

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206 623 7789

**TABLE OF CONTENTS**
(continued)

Page

II.   Plaintiffs Have Shown a Strong Likelihood of Success on the Merits on
Their Constitutional Claims .................................................................................18

    A.   RCW 29A.08.107 Imposes a Severe Burden on Plaintiffs' First and
    Fourteenth Amendment Rights...........................................................................19

    B.   RCW 29A.08.107 Serves No Compelling, or Even Legitimate,
    State Interest ..................................................................................................20

    C.   Even if the Burden Imposed by RCW 29A.08.107 Were Considered
    Less Than Severe, the Statute Could Not Withstand Scrutiny ..................21

III.   Plaintiffs Meet the Other Requirements for a Preliminary Injunction ....................22

    A.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ....................22

    B.   The Balance of Hardships Clearly Falls in Plaintiffs' Favor .......................23

    C.   The Public Interest Mandates a Grant of Injunctive Relief .......................23

CONCLUSION.....................................................................................................24

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623 1745; fax 206.623.7789

**TABLE OF AUTHORITIES**

**CASES**

Page

*ACORN* v. *Miller*, 129 F.3d 833 (6th Cir. 1997)..............................................................18

*Ayers-Schaffner* v. *DiStefano*, 37 F.3d 726 (1st Cir. 1994)...........................................21

*Bishop* v. *Lomenzo*, 350 F. Supp. 576 (E.D.N.Y. 1972) ...............................................18

*Black* v. *McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002)..........................................19

*Bullock* v. *Carter*, 405 U.S. 134 (1972)........................................................................20

*Burdick* v. *Takushi*, 504 U.S. 428 (1992) ...............................................................18, 21

*Bush* v. *Gore*, 531 U.S. 98 (2000) .................................................................................20

*California Democratic Party* v. *Jones*, 530 U.S. 567 (2000) .........................................19

*California ex rel. Lockyer* v. *Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004) ....................11

*Carrington* v. *Rash*, 380 U.S. 89 (1965).......................................................................20

*Charfauros* v. *Bd. of Elections*, 249 F.3d 941 (9th Cir. 2001)...........................19, 20, 22

*Charles H. Wesley Educ. Fdn., Inc.* v. *Cox*, 408 F.3d 1349 (11th Cir. 2005) ................24

*Common Cause/Georgia* v. *Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005)................24

*Condon* v. *Reno*, 913 F. Supp. 946 (D.S.C. 1995) .....................................................17, 18

*Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)......................................11

*Dunn* v. *Blumstein*, 405 U.S. 330 (1972)......................................................................18

*Elrod* v. *Burns*, 427 U.S. 347 (1976).............................................................................22

*Friedman* v. *Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004) .........................................17

*Gibbons* v. *Ogden*, 22 U.S. (9 Wheat) 1 (1824)............................................................11

*Harper* v. *Va. State Bd. of Elections*, 383 U.S. 663 (1966) .........................................20

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623-1745; fax 205.623.7789

# TABLE OF AUTHORITIES
## (continued)

Page

*Jackson* v. *Ogilvie*, 325 F. Supp. 864 (N.D. Ill. 1971) ................................................. 19

*Lerman* v. *Bd. of Elections*, 232 F.3d 136 (2d Cir. 2000) ................................................. 21

*Maine* v. *Thiboutot*, 448 U.S. 1 (1980).................................................................................. 10

*McDonald* v. *Bd. of Election Comm'rs*, 394 U.S. 802 (1969)............................................. 20

*McLaughlin* v. *N.C. Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995) ................................. 21

*Montano* v. *Suffolk County Legislature*, 268 F. Supp. 2d 243 (E.D.N.Y. 2003)............... 22

*New Alliance Party* v. *Hand*, 933 F.2d 1568 (11th Cir. 1991)........................................... 21

*O'Brien* v. *Skinner*, 414 U.S. 524 (1974)............................................................................. 20

*Reynolds* v. *Sims*, 377 U.S. 533 (1964) ..................................................................... 18, 22

*Rosario* v. *Rockefeller*, 410 U.S. 752 (1973) .................................................................... 19

*Sandusky County Democratic Party* v. *Blackwell*, 387 F.3d 565 (6th Cir. 2004).......... 10

*Save Our Sonoran, Inc.* v. *Flowers*, 408 F.3d 1113 (9th Cir. 2005) .................. 10, 18, 22

*Schwier* v. *Cox*, 340 F.3d 1284 (11th Cir. 2003) .............................................................. 10

*Schwier* v. *Cox*, 439 F.3d 1285 (11th Cir. 2006).............................................................. 17

*Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85 (1983)............................................................ 11

*Southwest Voter Registration Educ. Project* v. *Shelley*, 344 F.3d 914 (9th Cir. 2003) ....... 23

*Storer* v. *Brown*, 415 U.S. 724 (1974) ............................................................................... 21

*Tashjian* v. *Republican Party of Conn.*, 479 U.S. 208 (1986)........................................... 19

*Ting* v. *AT&T*, 319 F.3d 1126 (9th Cir. 2003)..................................................................... 11

*Wesberry* v. *Sanders*, 376 U.S. 1 (1964)............................................................................ 22

*Williamson* v. *Gen. Dynamics Corp.*, 208 F.3d 1144 (9th Cir. 2000) .......................... 11, 16

Pl. Mot. for Prelim. Injunction (CV 06-0726)

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206 623.7789

### TABLE OF AUTHORITIES
### (continued)

Page

*Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991)..................................................11

*Ex parte Yarbrough*, 110 U.S. 651 (1884)..............................................................................18

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................................19, 22

### OTHER AUTHORITIES

28 U.S.C. § 1331 ....................................................................................................................11

42 U.S.C. § 1971 ........................................................................................................10, 16, 17

42 U.S.C. § 1983 ............................................................................................................10, 11

42 U.S.C. § 15301 *et seq.*.................................................................................................*passim*

148 Cong. Rec. S10488-02, S10490 (2002) ......................................................................14, 15

FED. R. CIV. P. 65....................................................................................................................10, 24

H.R. Rep. 107-329(I) (2001)....................................................................................................14

RCW 29A.08.107.................................................................................................................*passim*

RCW 29A.08.140.......................................................................................................................8

RCW 29A.08.145.......................................................................................................................8

WAC 434-324-040.....................................................................................................................3

WASH. CONST. art. VI...............................................................................................................17

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

## PRELIMINARY STATEMENT

This motion is brought to enjoin the Secretary of State of Washington from implementing a new State election law that erects an illegal bureaucratic barrier to registering voters. Absent a preliminary injunction, the Secretary of State will disenfranchise thousands of eligible citizens in violation of Plaintiffs' rights under federal law and the United States Constitution. There is no other remedy for the deprivation of a right so fundamental to American citizenship.

This new Washington law, RCW 29A.08.107, prohibits the Secretary of State from registering eligible citizens if he cannot successfully "match" their name and identifying information with information in other government databases. Every new voter registration application must now include a name, date of birth, and driver's license or partial Social Security number, if one is available. Then the Secretary of State must attempt to "match" that information with the same information in the motor vehicle or Social Security databases. Un-matched applicants will not be registered, and will not be allowed to vote, unless county officials somehow ferret out and resolve the problem.

"Matching" information from one database to another may sound straightforward, but it is riddled with mistakes. Meaningless recordkeeping differences having no relation to voter eligibility – e.g., registering to vote with your married name rather than the maiden name in your Social Security records – will prevent registration. So too will the data entry errors, ministerial mistakes, typos, and computer glitches that plague all electronic databases, and render "matching" an error-prone and unreliable exercise. If a clerk misspelled an applicant's name 20 years ago – "Rob" rather than "Bob" – his registration information will not "match" and he will not be registered to vote.

The damage to the franchise is real and irreparable. Other states have already experienced unacceptable error rates. Recent attempts to match voter registration information in New York City yielded an error rate of approximately 20%, and in Virginia the "failed match" rate was much the same. In Los Angeles County, 18% of new voter registration records were returned by the California Secretary of State for failure to find a "match." The Social Security Administration

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1   itself has reported a 28.5% "failed match" rate. Even a 1% error rate in Washington would
2   jeopardize the registration of thousands of residents.

3        This "no match, no vote" precondition sabotages the very law it purports to implement,
4   the Help America Vote Act of 2002 ("HAVA"). HAVA was passed by Congress in the aftermath
5   of the troubled 2000 Presidential Election to *eliminate* barriers to voting. It requires the states to
6   create computerized voter registration lists in order to avoid the fiasco of eligible voters being
7   turned away from the polls when their names cannot be found on shoddy and outdated lists.
8   Congress mandated that the states be vigilant about maintaining and updating their computerized
9   registration lists. But only Washington and a handful of other outlier states have made computer
10   "matching" a precondition to voting, heralding an era of digital disenfranchisement.

11        Rather than facilitating the exercise of the franchise, as federal law and the Constitution
12   require, Washington has set up a new roadblock to voting. By making "matching" a precondition
13   to voting, RCW 29A.08.107 undermines HAVA, conflicts with the Voting Rights Act, and
14   violates the Constitution. Plaintiffs are more than likely to succeed on the merits of these claims
15   and will be irreparably harmed if a preliminary injunction is not granted.

16                      **STATEMENT OF FACTS**

17        Plaintiffs are (1) organizations whose members include eligible but unregistered
18   Washington voters who will attempt to register to vote in the above elections, but will be omitted
19   from the official list of registered voters and unable to cast a valid vote, and (2) organizations that
20   seek to register low-income voters and to reduce barriers to fair and efficient voting whose
21   missions will be frustrated by Washington's new election law.

22      **A.**     **Washington's New "Matching" Statute**

23        Effective January 1, 2006, eligible applicants will not be registered to vote unless the
24   Secretary of State is able to "match" registration information with information in the Department
25   of Licensing ("DOL") or Social Security Administration ("SSA") databases. RCW 29A.08.107,
26   as amended by 2005 Wash. Legis. Serv. Ch. 246 (S.S.B. 5743) (West). The applicant's name,
27   date of birth, and driver's license number or Social Security digits entered from the registration
28   form will be compared with one of these databases. "Only after the secretary of state has . . .

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1  match[ed]" the applicant's driver's license or Social Security number, "or determined that the
2  applicant does not have" one of these numbers, "may the applicant be placed on the official list of
3  registered voters." RCW 29A.08.107(3).

4      The statute does provide that the Secretary of State or a county auditor will try to
5  "correspond" with applicants when "a match cannot be made," RCW 29A.08.107(1), but that is
6  no guarantee that eligible voters will be registered. On the contrary, if for any reason the
7  applicant does not respond, or if for some other reason errors remain unresolved after 45 days,
8  "the applicant will not be registered to vote" and the application will be sent to "document
9  storage." RCW 29A.08.107(2).  (See Appendix for full text of statute.)

10      **B.    Overview of the "Matching" Process**

11      After January 1, 2006, eligible citizens will fill out voter registration applications by hand
12  or convey their information orally. Their applications will be submitted in person or by mail to an
13  appropriate State or county office. The applications will then be transferred to the county
14  auditor, who will input the data from the applications into a new electronic "Registration
15  Record." That record will then be transferred electronically to the Secretary of State for
16  "matching." WAC 434-324-040. The Secretary of State will attempt to "match" the Registration
17  Record with information in the DOL or SSA database.

18      Registration Records with Social Security digits will be "matched" this way: the Secretary
19  of State – with the assistance of the DOL and the American Association of Motor Vehicle
20  Administrators ("AAMVA") – will attempt to "match" information with information collected by
21  the SSA. A Registration Record will be submitted electronically (through the DOL) for
22  comparison with SSA data. First, the computer will look for all SSA records which have the
23  exact same Social Security digits as the applicant. Since one in 10,000 Americans share the same
24  last four digits of their Social Security numbers, there will be thousands of such "matches." Then,
25  the computer will attempt to "match" the first name, last name, month of birth, and year of birth in
26  the applicant's Registration Record to the information in the SSA records with the same Social
27  Security digits. Only when there is a 100% match – i.e., every character and number in every

28

HILLIS CLARK MARTIN &
PETERSON, P.S.

600 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206 623 7789

### 1.   Entering the Data

Data entry operators make mistakes when they input information written down by hand or provided to them orally. Such errors may occur when an operator strikes an incorrect key, incorrectly processes information given orally (*e.g.*, "Kriedler" becomes "Kreidler"), or incorrectly reads information from a form (*e.g.*, "Juan" becomes "Joan"). (*See* Appendix for other typical data entry errors.)

Such data entry errors are common and will certainly occur here. One study by Abt Associates found that as many as 26% of records listed in a Florida social service database included misspelled city names. Indeed, the database contained 40 spelling variations of Fort Lauderdale.[2] Other studies contain similar findings. Borthwick Decl. ¶ 23; *see also id.* ¶¶ 20-22.

These data entry errors affect numbers just as they affect names. Social Security numbers are notoriously prone to data entry errors. The leading expert on record matching for the U.S. Census Bureau estimates that in one large California employment database, for example, "the records [associated] with each individual can expect to contain at least two errors where the [Social Security number] has been mis-keyed or transcribed improperly." *Id.* ¶ 25.

### 2.   Maintaining, Storing, Transferring, and Transforming the Data

Once an electronic record is created for an individual registrant, the State must maintain, store, transfer and, often, transform the data contained in that record. Federal and State officials must perform similar tasks with respect to the SSA and DOL databases. Human error or computer malfunction made or occurring during the process of maintaining, storing, transferring, and transforming these records can cause errors within individual records. These errors, in turn, can prevent information from "matching." *Id.* ¶¶ 26-29; *see also id.* ¶¶ 30-31.

### 3.   "Matching" the Data

False negatives result not only from data entry mistakes, maintenance errors, and overall systems glitches. They are intrinsic to the process of "matching," and can occur even where the

---

[2]   Nancy Cole & Ellie Lee, Abt Assocs., Inc., Feasibility and Accuracy of Record Linkage to Estimate Multiple Program Participation, vol. III, Results of Record Linkage, at 20 (Econ. Research Serv., Elec. Publ'ns from the Food Assistance & Nutrition Research Program, 2004).

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 5 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1    original data was inputted correctly into both databases and has been maintained without incident.

2    That is because there are all sorts of trivial differences in personal information that will lead a

3    computer to conclude that two records do not represent the same person when, in fact, they do.

4         For example, a person may be listed under a nickname in one database (*e.g.*, "Sam") but a

5    full name in another (*e.g.*, "Samuel"). A person may be listed under a maiden name in one

6    database but a married name in another. A person may be listed with a punctuation mark in one

7    database (*e.g.*, "O'Brien") but without in another (*e.g.*, "O Brien" or "OBrien"). A person may

8    be listed under one spelling of a transliterated name in one database (*e.g.*, "Mohammed") but a

9    different spelling in another (*e.g.*, "Muhammad"). (*See* Appendix for other inconsistencies.) All

10   of these discrepancies are commonplace and will prevent an exact "match." *Id.* ¶¶ 32-36.

11           **4.**     **The Disproportionate Effect of "Matching"**

12         False negatives often arise when attempting to match the names of members of certain

13   racial and ethnic groups. *Id.* ¶ 37. This is an issue of particular importance to states like

14   Washington with comparatively large minority populations. Washington's Asian-American

15   population, for example, is 150% of the national average – and Asian-American citizens are

16   particularly susceptible to some of the matching errors described above. For example,

17   transposition of the given name and surname is common because many Asian Americans present

18   their surname first and their given name second. Names are also more likely to be misspelled if

19   state and county officials are less familiar with the minority populations' common names or

20   naming conventions. *See id.* ¶ 38.

21         Improper separation and combination of fields is more common with regard to Latinos,

22   many of whom use both maternal and paternal last names. Incorrect spellings of unique names, or

23   of derivatives of common names, are particularly prevalent in the African-American community.

24   Mismatched transliterated names are more common in communities whose primary language does

25   not use the Roman alphabet or uses diacritical marks not found in English. Transposed date and

26   month of birth is more common with regard to recent immigrants, who may present dates in the

27   day-month-year configuration standard in many countries. And mismatched surnames due to a

28   maiden name or married name are, of course, more common with regard to women. *Id.* ¶¶ 37-42.

---

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 6 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

### 5.     The Unacceptable Error Rates

The impact of all these matching errors is exacerbated by Washington's matching methodology. For applications with Social Security digits, the information will only be "matched" if the first name, last name, month of birth, year of birth, and Social Security digits all correspond exactly, character-by-character. Variation in just one character will cause the "match" to fail. These sorts of exact, character-by-character "matching" criteria are known as "deterministic" matching protocols -- and they are known to be deeply flawed.

Based on other efforts to "match" voter registration information, the error rate in Washington could be as high as 20-30%. In New York City in September 2004, the City Board of Elections sent 15,000 registration applications with driver's license numbers to the state Department of Motor Vehicles ("DMV") to be "matched" with a protocol similar to the one used in Washington. An audit revealed that nearly 20% of the applications could not be "matched" due to typos and other data entry errors. Had the city attempted to "match" other information, like name and birth date, the error rate would likely have been even higher. *Id.* Ex. E. A similar protocol was recently used in Virginia to "match" the Social Security number on voter registration applications to Social Security numbers on the state's motor vehicles file. Of 80,000 records processed, approximately 20% were unable to be "matched." Cplt. ¶ 63.

As explained in the accompanying declaration of Conny McCormack, the Registrar-Recorder and County Clerk for Los Angeles County, a deterministic matching protocol involving name and identifying number was used in California to "match" information on voter registration applications with information in the state DMV and the SSA databases. McCormack Decl. ¶ 8. Over the first 14 weeks of the year, 18% of the voter registration records were returned by the state's computerized system for failure to find a "match." An additional 7.5% of the registration records were returned unmatched due to system errors. *Id.* ¶ 12.

The SSA recently reported that of 143,000 voter registration records submitted nationwide to the SSA through January 2006, 28.5% resulted in a failed "match." Thus, using the matching system used in Washington, more than one in four voter registration applications were not successfully "matched" to information in the SSA database. It is likely that the vast majority of these failed matches represent false negatives. Borthwick Decl. ¶¶ 47-48.

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206.623.7789

### D.    The Inadequacy of Follow-Up

An enormous number of voter registration applications will fail to "match," and it will be virtually impossible to correct these errors in time to avoid disenfranchising eligible citizens. RCW 29A.08.107(2) does contain a 45-day correction period that requires the Secretary of State or a county auditor to "correspond" with applicants whose information cannot be "matched," but no matter how well intentioned, this labor-intensive correspondence campaign will not find every "unmatched" applicant and will not cure every falsely rejected application.

*First*, the Secretary of State and the county auditors will be overwhelmed by failed "matches" in the weeks before an election, precisely when there is no room for error. As explained in the accompanying declarations of Ms. McCormack and Michael McDonald, professor of political science at George Mason University, registration forms typically flood in during the final week before the registration deadline. McCormack Decl. ¶¶ 15-16; McDonald Decl. ¶ 14. In 2004, Washington logged 68,049 forms in the week before the registration deadline – more than 20 times the weekly count earlier in the year. McDonald Decl. ¶ 14 & Ex. B. The number of "failed matches" will skyrocket as well.

*Second*, the 45-day period is an illusion in the weeks before an election. A voter may register up to 30 days prior to an election, RCW 29A.08.140, and can still register to vote by absentee ballot if she registers in person at certain locations at least 15 days prior to an election, RCW 29A.04.145. Under RCW 29A.08.107, "failed matches" must be resolved in *these* abbreviated periods if the citizen is to cast a valid vote in the upcoming election.

*Third*, election officials will have difficulty even making contact with many "unmatched" applicants. The very same mistakes in personal information that result in non-matches will result in mistakes in phone numbers and street addresses. Some of these errors will preclude effective contact with eligible citizens who have fallen victim to "failed matches."

*Fourth*, even if reached, many applicants will not be able to identify and correct the non-match because many of these problems will result from unseen errors or inconsistencies in the SSA and DOL databases, rather than from any error made by the applicant. Many applicants will never be made aware of the minor errors or inconsistencies in the comparison database because *no one will know why there was no "match" – and therefore no one will be able to tell them how*

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 8 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206 623 7789

1   *to fix the problem.* The U.S. Government Accountability Office reported earlier this year that in

2   "matching" Social Security numbers, "the biggest problem [state officials] are facing is that SSA

3   is not specifying what voter information was not matching, (*i.e.,* was the mismatch in name, date

4   of birth, or 4-digit Social Security number). Without this information they are not able to

5   efficiently resolve the non-matching problems." Dunne Decl. Ex. B at 36.

6        **E.**    **The Irreparable Harm to Plaintiffs**

7        The "match" process in place in Washington will fail; in similar circumstances, it fails as

8   often as 20-30% of the time. It will be impossible to correct many of these "failed" matches in a

9   timely fashion. Because RCW 29A.08.107 makes a successful "match" a precondition to

10  registration, eligible Washington residents who attempt to vote will be prevented from doing so,

11  even when they have submitted timely and accurate voter registration forms.

12        Plaintiffs Washington Association of Churches, Washington Association of Community

13  Organizations For Reform Now, Organization of Chinese-Americans – Greater Seattle Chapter,

14  Filipino American Political Action Group of Washington, Korean American Voters Alliance,

15  Service Employees International Union – Local 775, and Washington Citizen Action are

16  membership organizations that engage in public policy education and advocacy, community

17  organizing in low-income communities, and voter registration drives; the Chinese Information &

18  Service Center does the same on behalf of its clients. Through this action, Plaintiffs seek to avert

19  the ongoing frustration of their organizational purposes, weakening of their advocacy efforts,

20  diversion of their organizational resources, and impeding of their abilities to raise revenues that

21  has resulted from the Secretary of State's actions.

22        Plaintiffs also bring this action to prevent the unlawful disenfranchisement of certain of

23  their members, clients, and constituents who are over 18 years of age, United States citizens, and

24  residents of Washington who are eligible but not registered to vote at their current residence.

25  These individuals will want to vote in the September 19, 2006 primary elections or in the

26  November 7, 2006 general election. They will attempt to register to vote before the registration

27  deadline, but because of Washington's new "matching" law will be kept off the official list of

28  registered voters and, therefore, will be unable to cast a valid vote.

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 9 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206 623 7789

## ARGUMENT

Courts in the Ninth Circuit consider two tests in determining whether to issue a preliminary injunction under Fed. R. Civ. P. 65. Under the "'traditional' criteria," a plaintiff must show: "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Save Our Sonoran, Inc.* v. *Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (quotation omitted). In the alternative, a court may grant the injunction if a plaintiff "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* (quotation omitted). These alternative formulations "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum." *Id.* (quotation omitted). Here, Plaintiffs easily meet either test.

**I.    Plaintiffs Have Shown a Strong Likelihood of
        Success on the Merits on Their Federal Statutory Claims**

Plaintiffs are likely to succeed on their claims that RCW 29A.08.107 violates HAVA, 42 U.S.C. § 15301 *et seq.*, and the Voting Rights Act of 1870, as amended ("Voting Rights Act"), 42 U.S.C. § 1971. HAVA requires states to create statewide voter registration databases so that eligible voters are not disenfranchised due to administrative errors; the Voting Rights Act prohibits states from disenfranchising voters on the basis of immaterial errors in registration. In contrast, RCW 29A.08.107 requires the Secretary of State to reject eligible voters' applications when immaterial administrative errors or inconsistencies prevent a "match."

Federal law provides a private right of action against persons who, acting under the color of law, cause the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Section 1983 provides a means to vindicate not only violations of constitutional rights, but also violations of rights created by federal statutes, *see Maine* v. *Thiboutot*, 448 U.S. 1, 7-8 (1980), including rights guaranteed by HAVA, *see Sandusky County Democratic Party* v. *Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004), and the Voting Rights Act, *see Schwier* v. *Cox*, 340 F.3d 1284, 1296-97 (11th Cir. 2003). As

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 10 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1  demonstrated below, there is a strong likelihood that Plaintiffs will succeed on the merits of their

2  claims that, by enforcing RCW 29A.08.107, the Secretary of State will deny them rights secured

3  by HAVA and the Voting Rights Act and guaranteed by the Constitution (discussed in Argument

4  II, *infra*). Thus, they have demonstrated probable success on their Section 1983 claims.

5         The Supremacy Clause provides an independent basis for Plaintiffs' claims. Due to the

6  conflicts with HAVA and the Voting Rights Act, RCW 29A.08.107 is preempted by federal law.[3]

7  Under the Supremacy Clause of the United States Constitution, "state laws that 'interfere with, or

8  are contrary to the laws of congress, made in pursuance of the constitution' are invalid."

9  *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons v. Ogden*, 22

10  U.S. (9 Wheat) 1 (1824)). Even in an area of traditional state regulation, Congress may preempt

11  state law, *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), either by

12  expressly stating that state law is preempted, by occupying a regulatory field, or through so-called

13  "conflict preemption" – "where it is impossible to comply with both state and federal

14  requirements, or where state law stands as an obstacle to the accomplishment and execution of

15  the full purposes and objectives of Congress." *Williamson v. Gen. Dynamics Corp.*, 208 F.3d

16  1144, 1149 (9th Cir. 2000) (quotation omitted).

17         "Under the obstruction strand of conflict preemption, an aberrant or hostile state rule is

18  preempted to the extent it actually interferes with the methods by which the federal statute was

19  designed to reach [its] goal." *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003) (quotation

20  marks and citation omitted). Thus, as is the case here, a state law runs afoul of the Supremacy

21  Clause and is preempted where it "stands as an obstacle to the accomplishment of the full

22  purposes and objectives of Congress." *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831,

23  849 (9th Cir. 2004). Accordingly, Plaintiffs also have a strong likelihood of success on their claim

24  that RCW 29A.08.107 directly conflicts with and is preempted by federal law.

25

26

27  _____

[3]  Plaintiffs' preemption claims "arise under" federal law and thus present federal questions as to which this

28  Court has jurisdiction under 28 U.S.C. § 1331. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

## A.    RCW 29A.08.107 Conflicts with and Violates HAVA

Because RCW 29A.08.107 instructs the Secretary of State not to place an applicant on the official list of registered voters until he has "matched" the applicant's driver's license number or Social Security digits with existing records of the DOL or SSA, or determined that the applicant has neither such number, Plaintiffs have a strong likelihood of success on their claim that RCW 29A.08.107 directly conflicts with and violates HAVA.

The language and legislative history of HAVA, which was passed in the wake of the 2000 Presidential Election, make clear that the statute was passed in large part to ensure that eligible voters would not be left off the voting rolls or turned away from the polls. HAVA thus seeks to ensure that voting and election administration systems will "be the most convenient, accessible, and easy to use for voters" and will "be nondiscriminatory and afford each registered and eligible voter an equal opportunity to vote and to have that vote counted." 42 U.S.C. §§ 15381(a)(1) and (3). It does so by mandating certain uniform practices in every state in order to eliminate bureaucratic barriers to voting. Three of HAVA's provisions are especially important here:

*First*, HAVA requires states to create reliable registration rolls by implementing a uniform, regularly updated computerized statewide voter registration list. *Id.* § 15483(a). To this end, the statute requires all registration applicants to provide a unique identifying number – their driver's license number or the last four digits of their Social Security number (if they have such numbers) – with their applications. *Id.* § 15483(a)(5)(A). HAVA then requires states to "match" those numbers with databases maintained by the motor vehicle authority or SSA. *Id.* § 15483(a)(5)(B). Applicants who don't have a driver's license or Social Security number need not be "matched."

*Second*, those applicants whose information is successfully "matched" are exempted from the voter ID requirements for first-time voters who register by mail. *See id.* § 15483(b)(3)(B). If a first-time voter who registered by mail is unable to provide a numerical identifier, or if the state is unable to match that number, HAVA still permits her to vote a regular ballot after providing other forms of ID. *Id.* § 15483(b)(1).

*Third*, even if a voter is unable to provide acceptable ID, HAVA allows that voter to cast a provisional ballot that will be counted if election officials can subsequently confirm the voter's eligibility. *Id.* § 15483(b)(2)(B).

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 12 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1    In other words, under HAVA, voters need *not* be successfully "matched" in order to

2   register and vote, and no provision requires or permits a voter to be disenfranchised if the

3   "match" should fail. Indeed, in all but a handful of outlier states, "matching" is *not* a precondition

4   to voting. Across the country, the most common consequence of a failed "match" is that the

5   voter must produce some form of ID at the polls. *See* Borthwick Decl. Ex. C at 16-17.

6             1.      **RCW 29A.08.107 Obstructs the Goals of Congress in Enacting**
                      **HAVA's Computerized Statewide Registration List Provision**
7

8           RCW 29A.08.107 stands as an obstacle to Congress's goals in enacting Section 303(a) of

9   HAVA ("Section 303(a)"), 42 U.S.C. § 15483(a). One of the primary purposes of HAVA is to

10  reduce the burdens on voting caused by sloppy and incomplete voter registration lists. For

11  decades, voters have been turned away from the polls or discouraged from voting due to

12  neglected and poorly maintained voter registration lists, most of which varied from county to

13  county, and state to state, all across the country. *See* Dunne Decl. Ex. C at 34.

14          To remove this bureaucratic barrier to voting, HAVA requires the chief election official in

15  each state to implement, in a uniform and nondiscriminatory manner, a "single, uniform, official,

16  centralized, interactive computerized statewide voter registration list" that "contains the name and

17  registration information of every legally registered voter in the State and assigns a unique

18  identifier to each legally registered voter in the State." 42 U.S.C. § 15483(a)(1)(A). This

19  "computerized list" is required to be "the single system for storing and managing the official list of

20  registered voters throughout the State." *Id.* § 15483(a)(1)(A)(i).

21          To facilitate the orderly maintenance of the new computerized registration lists, Congress

22  provided a mechanism for states to assign a "unique identifying number" to each new registered

23  voter. *Id.* § 15483(a)(5). These unique identifiers help states keep track of voters who move and

24  re-register in a new location, and reduce the possibility of duplicate registrations. The easiest way

25  to reliably attach a unique identifier to each individual's record is to use an identifier that the

26  individual has already been assigned. Therefore, HAVA states that an applicant for registration

27  must provide her driver's license number, or if she has none, the last four digits of her Social

28

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 13 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206 623 7789

1 | Security number. *Id.* § 15483(a)(5)(A)(i)(I) and (II). (Applicants without either are simply

2 | assigned a number. *Id.* § 15483(a)(5)(A)(ii).)

3 |     HAVA also directs states to attempt to "match" those numbers with records in other state

4 | databases, to ensure confidence that the numbers are accurately assigned; otherwise, two records

5 | might end up labeled with the same "unique" number. To this end, HAVA requires each state's

6 | chief election official to make an agreement with the state's motor vehicle authority "to match

7 | information in the database of the statewide voter registration system with information in the

8 | database of the motor vehicle authority." *Id.* § 15483(a)(5)(B)(i).

9 |     It is crucial to recognize that Section 303(a)'s "matching" provision, for validating unique

10 | identifiers, was intended as an administrative safeguard for "storing and managing the official list

11 | of registered voters," and *not* as a restriction on voter eligibility. *See id.* § 15483(a)(1)(A)(i).

12 | That is why HAVA provides that "a unique identifier is assigned to each legally registered voter in

13 | the State," *id.* § 15483(a)(1)(A)(iii), but does not provide that the unique identifier must be

14 | "matched" before a voter can be legally registered. Reinforcing this point, new registrants with

15 | no current and valid driver's license or Social Security number – for example, many new citizens,

16 | elderly residents, and teenage voters – are simply assigned a unique number and placed on the

17 | computerized list of registered voters, without any subsequent "matching." *Id.* §

18 | 15483(a)(5)(A)(ii). It is the assignment of a unique identifying number to each new voter – and

19 | not the "match" – that is the requirement under Section 303(a).

20 |     Legislative history confirms the Congressional intent. Senator Bond, the chief Senate

21 | Republican sponsor of HAVA, explained that a unique identifying number is assigned to each new

22 | registrant to create dependable lists, not to impose an obstacle to registering or voting:

23 |         The conferees agree that a unique identification number attributed
   to each registered voter will be an extremely *useful tool for State*

24 |         *and local election officials in managing and maintaining clean
   and accurate voter lists.* It is the agreement of the conferees that

25 |         election officials must have such a tool.

26 | 148 Cong. Rec. S10488-02, *S10490 (daily ed. Oct. 16, 2002) (emphasis added); *see also* H.R.

27 | Rep. 107-329(I), at 36 (2001) (unique identifier "will be used to assure that list maintenance

28 | functions are attributed to the correct voter"). As more of these unique identifying numbers are

HILLIS CLARK MARTIN &
PETERSON, P.S

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206 623.7789

1 | validated over time, states will be able to identify with greater certainty when a voter who has

2 | moved and applied to register in a new jurisdiction is still on the list in her old jurisdiction.

3 |         **2.    RCW 29A.08.107 Makes It Impossible for Washington to Comply with HAVA's Identification Provisions**

4 |

5 |      RCW 29A.08.107 conflicts with HAVA by making it impossible for the State to comply

6 | with the identification provisions of Section 303(b) of HAVA ("Section 303(b)"), 42 U.S.C.

7 | § 15483(b). Section 303(b) requires that a first-time voter who registers by mail must verify her

8 | identity before voting. She may do so by showing some form of documentary identification either

9 | at the time of registration or when she votes (by mail or in-person at the polls) *See* 42 U.S.C.

10 | § 15483(b)(2)(A), (3)(A). However, such identification is not required if the information on the

11 | voter's registration application has been "matched." *Id.* § 15483(b)(3)(B).

12 |      In other words, "matching" in this context serves as a substitute for voter ID. A first-time

13 | voter registering by mail will be permitted to vote if she shows some ID *or* if she's been

14 | "matched." Consequently, a new mail-in registrant need *not* be "matched" in order to be

15 | registered and in order to vote. She can register and vote a regular ballot by submitting

16 | documentary ID with her registration application or by showing such ID at the polls. HAVA's

17 | "matching" provisions merely provide a way to relieve first-time voters who register by mail from

18 | having to show documentary proof of identity when registering or voting. Or, as Senator Bond

19 | put it, "*[i]n lieu of* the individual providing proof of identity, States may also electronically verify

20 | an individual's identity against existing State databases." 148 Cong. Rec. S10488-02, *S10489

21 | (daily ed. Oct. 16, 2002) (emphasis added). By prohibiting the Secretary of State from registering

22 | voters who do not "match," RCW 29A.08.107 violates the right of first-time voters who register

23 | by mail to vote a regular ballot after showing documentary ID, pursuant to Section 303(b).

24 |         **3.    RCW 29A.08.107 Also Makes It Impossible for Washington to Comply with HAVA's "Fail-Safe" Provisional Ballot Provision**

25 |

26 |      RCW 29A.08.107 also conflicts with HAVA in making it impossible for the State to

27 | comply with the provisional ballot provisions of Section 303(b). Under HAVA, a first-time, mail-

28 | in registrant who fails to present ID, and has not been "matched," *still* must be allowed to vote.

*PI. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 15 of 24*

HILLIS CLARK MARTIN & PETERSON, P S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206.623 7789

1   Under those circumstances, HAVA's "Fail-safe voting" provisions govern: such a first-time voter

2   has the right to cast a "provisional ballot." 42 U.S.C. § 15483(b)(2)(B). Under § 15482 of

3   HAVA, which governs all provisional ballots (including those cast under § 15483(b)(2)(B)), a

4   voter may cast a provisional ballot upon affirming that the voter is validly registered. *See id.*

5   § 15482(a)(2). That is, a first-time voter registering by mail whose information has not been

6   "matched" may vote a provisional ballot, as long as she affirms that she is validly registered.

7   Therefore, despite RCW 29A.08.107, it cannot be that a state's failure to find a "match" can

8   preclude registration. If "matching" were intended by Congress to be an absolute precondition to

9   registration, this "fail-safe" voting mechanism would be a charade. Indeed, Washington's "no

10  match, no vote" rule would completely nullify HAVA's "Fail-safe voting" mechanism for first-

11  time voters without ID: no "unmatched" voter would be registered, and therefore no

12  "unmatched" voter would be eligible to cast a provisional ballot under § 15483(b)(2)(B).

13                              *       *       *

14          By refusing to register voters until a "match" is made, or it is determined that the voter has

15  no identifying number to be matched, RCW 29A.08.107 stands as an obstacle to achieving the

16  purposes and objectives of Section 303(a) and makes it impossible for the State to comply with

17  the identification and provisional ballot provisions of Section 303(b). *See Williamson*, 208 F.3d

18  at 1149. It also violates the rights of eligible but unmatched citizens to be placed on the list of

19  registered voters and to cast regular or provisional ballots under Sections 303(a) and (b).

20  Accordingly, the Washington law violates and is preempted by federal law.

21      **B.**     **RCW 29A.08.107 Conflicts with and Violates the Voting Rights Act**

22          Plaintiffs also have a strong likelihood of success on their claim that RCW 29A.08.107

23  conflicts with and violates the Voting Rights Act. Section 1971 of the Act provides that

24              No person acting under color of law shall . . . deny the right of any
                individual to vote in any election because of an error or omission on
25              any record or paper relating to any application, registration, or
                other act requisite to voting, if such error or omission is not
26              material in determining whether such individual is qualified under
                State law to vote in such election.
27
28  42 U.S.C. § 1971(a)(2)(B). This section of the law, "often referred to as 'the materiality

    provision,' was designed to eliminate practices that could encumber an individual's ability to

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 16 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206 623 7789

1  register to vote." *Friedman* v. *Snipes*, 345 F. Supp. 2d 1356, 1370-71 (S.D. Fla. 2004) (citation
2  omitted).[4]  Congress adopted the materiality provision specifically "to deal with the problem of
3  registering as a deterrent to voting. . . . This was necessary to sweep away such tactics as
4  disqualifying an applicant who failed to list the exact number of months and days in his age."
5  *Condon* v. *Reno*, 913 F. Supp. 946, 949-50 (D.S.C. 1995).

6         An error or omission on any record or paper relating to voter registration that prevents the
7  State from "matching" an applicant's information is not "material" in determining whether the
8  applicant is qualified to vote under Washington law.  "Matching" information from one database
9  to another is useful in validating the unique ID number attached to a registration entry for record-
10 keeping purposes.  In contrast, errors in the process of "matching" information between databases
11 are not material in determining whether an applicant is a U.S. citizen; whether she is at least 18
12 years old; whether she is a resident of the State, county, and precinct in which she seeks to vote
13 for the 30 days prior to the election; whether she has been convicted of an infamous crime without
14 restoration of her civil rights; or whether she has been judicially declared mentally incompetent.
15 Under Washington's Constitution, only these factors bear on an individual's qualification to vote.
16 WASH. CONST. art. VI, §§ 1, 3.  The types of data errors or inconsistencies that preclude a
17 successful "match," *see supra*, provide no material information about any of these factors.

18        Such nonmaterial errors and omissions cannot be used to deny the right to vote. *See*
19 *Schwier* v. *Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (affirming grant of summary judgment to
20 voters challenging Georgia's requirement that applicants disclose their full Social Security
21 numbers "because such information is not 'material' to a voter registration system under §
22 1971(a)(2)(B) of the Voting Rights Act").  Because RCW 29A.08.107 prevents voters from
23 registering in the event of such immaterial errors, the statute is in direct conflict with the
24 materiality provision of the Voting Rights Act.

25                              *        *        *

26

27   [4]   The Voting Rights Act safeguards the right to "vote," defined as including "all action necessary to make a
vote effective *including*, but not limited to, *registration* or other action required by State law prerequisite to
28   voting . . . ." 42 U.S.C. § 1971(e) (emphasis added).

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 17 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623.1745; fax 206 623.7789

1    Accordingly, Plaintiffs have shown a strong likelihood that they will succeed on the merits

2  of their claims that the "matching" provision of RCW 29A.08.107 conflicts with and violates

3  HAVA and the Voting Rights Act. Plaintiffs certainly have shown the existence of substantial

4  questions as to these claims. Such questions are sufficient to support the grant of a preliminary

5  injunction if, as in this case, the balance of hardships tips sharply in Plaintiffs' favor. *See Save*

6  *Our Sonoran*, 408 F.3d at 1120.

7  **II.    Plaintiffs Have Shown a Strong Likelihood of**

8  **Success on the Merits on Their Constitutional Claims**

9    The First and Fourteenth Amendments to the U.S. Constitution protect the right to vote as

10  a fundamental right. *See, e.g., Burdick* v. *Takushi*, 504 U.S. 428, 433 (1992) ("It is beyond cavil

11  that 'voting is of the most fundamental significance under our constitutional structure.'") (citation

12  omitted); *Reynolds* v. *Sims*, 377 U.S. 533, 561-62 (1964) ("[T]he right of suffrage is a

13  fundamental matter in a free and democratic society."). The right to vote extends to all phases of

14  the voting process, including registration. *See Ex parte Yarbrough*, 110 U.S. 651 (1884);

15  *ACORN* v. *Miller*, 129 F.3d 833, 834-35 (6th Cir. 1997) (noting that unconstitutional election

16  regulations include "restrictive or prohibitively inconvenient voter registration requirements that

17  discourage or even prevent qualified voters from registering and participating in elections");

18  *Condon*, 913 F. Supp. at 949 ("[R]egistration, rather than being simply a mechanism to facilitate

19  orderly elections, [may be] in fact a significant barrier to voting."); *Bishop* v. *Lomenzo*, 350 F.

20  Supp. 576, 587 (E.D.N.Y. 1972) ("The state may not deny a voter the right to register (and hence

21  to vote) because of clerical deficiencies.").

22    Laws that deny the franchise to eligible voters must be narrowly tailored to advance a

23  compelling state interest. *See Dunn* v. *Blumstein*, 405 U.S. 330, 336 (1972). Even when

24  assessing regulations that impact the right to vote only indirectly – *e.g.*, restrictions on candidates'

25  ballot access – the Supreme Court has made clear that courts must apply strict scrutiny when the

26  challenged practices impose severe burdens on voting rights. *See Burdick*, 504 U.S. at 434.

27  Although "the State's important regulatory interests are generally sufficient to justify" "reasonable

28  nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters," when

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 18 of 24*

HILLIS CLARK MARTIN &
PETERSON, P S

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1  voters' rights are subjected to "severe" restrictions, strict scrutiny attaches, and the regulation
2  must be "narrowly drawn to advance a state interest of compelling importance." *Id.*

### A.  RCW 29A.08.107 Imposes a Severe Burden on Plaintiffs' First and Fourteenth Amendment Rights

5  By refusing to register eligible applicants whose information is not successfully "matched,"
6  or who are determined to have no identifying numbers, RCW 29A.08.107 imposes the severest of
7  burden on Plaintiffs' fundamental voting rights, including their rights under the First and
8  Fourteenth Amendments: complete denial of the right to vote.
9  RCW 29A.08.107 burdens Plaintiffs' First Amendment rights of expression and
10 association. Although "[s]elf-expression through the public ballot equally with one's peers is the
11 essence of a democratic society . . . [and] [a] citizen without a vote is to a large extent one
12 without a voice in decisions which may profoundly affect him and his family," *Rosario* v.
13 *Rockefeller*, 410 U.S. 752, 764 (1973), RCW 29A.08.107 prevents eligible voters from engaging
14 in protected political speech. It also burdens Plaintiffs' associational rights. *See, e.g., Cal.*
15 *Democratic Party* v. *Jones*, 530 U.S. 567, 574 (2000); *Jackson* v. *Ogilvie*, 325 F. Supp. 864, 867
16 (N.D. Ill. 1971) ("Unquestionably the right to freedom of association is a concomitant of the right
17 to vote and exists conterminously with it."). Plaintiffs' associational rights will be burdened by
18 loss of critical votes for candidates and policy initiatives supported by Plaintiffs, thus weakening
19 their message in the public debate. With each vote lost, Plaintiffs also lose the concomitant
20 strength in advocating in the political arena for their policy priorities. *See Tashjian* v. *Republican*
21 *Party of Conn.*, 479 U.S. 208, 214 (1986). Further compounding its harm, RCW 29A.08.107
22 violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment. As
23 recognized for more than a century, the right to vote is "a fundamental political right, because
24 preservative of all rights. *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886)); *see also Charfauros* v.
25 *Bd. of Elections*, 249 F.3d 941, 950-51 (9th Cir. 2001). Thus, "the right to vote, the right to
26 have one's vote counted, and the right to have one's vote given equal weight are basic and
27 fundamental constitutional rights incorporated into the due process clause of the Fourteenth
28 Amendment." *Black* v. *McGuffage*, 209 F. Supp. 2d 889, 900 (N.D. Ill. 2002).

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 19 of 24*

HILLIS CLARK MARTIN & PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

RCW 29A.08.107 also violates Plaintiffs' rights under the Equal Protection Clause. *See generally Bullock v. Carter*, 405 U.S. 134, 141 (1972) (when regulating elections, states' "power must be exercised in a manner consistent with the Equal Protection Clause"); *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966). Even when lines are not drawn according to the most suspect categories, voting regulations will not withstand Equal Protection scrutiny if they arbitrarily and unreasonably disenfranchise some segment of the electorate without sufficient justification, since "States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." *Carrington v. Rash*, 380 U.S. 89, 96 (1965); *see also O'Brien v. Skinner*, 414 U.S. 524, 530-31 (1974) (holding that "wholly arbitrary" statutes allowing detainees held outside home counties to vote while disenfranchising detainees held within home counties "deny appellants the equal protection of the laws guaranteed by the Fourteenth Amendment"); *Charfauros*, 249 F.3d at 945-46, 951-52 (finding Equal Protection violation where right to cast secret ballot was allocated differently to "two classes of challenged voters – Republican voters, whose eligibility was challenged by the Democratic Party . . . and Democratic voters, whose eligibility was challenged by the Republican Party").

RCW 29A.08.107 arbitrarily and unreasonably creates two classes of eligible voters: those whose information is successfully "matched," and those whose information is not. Eligible voters in the first group are permitted to register and vote, while those in the second are denied the right to do so. Washington's different treatment of "matched" and "unmatched" voters is not "consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Bush v. Gore*, 531 U.S. 98, 105 (2000).

Only by registering all eligible applicants will Washington accord "the equal dignity owed to each voter" required by the Fourteenth Amendment. *Id.* at 104.

**B.      RCW 29A.08.107 Serves No Compelling, or Even Legitimate, State Interest**

The strict scrutiny applicable to severe restrictions on voting like those imposed by RCW 29A.08.107 requires a careful evaluation of the State's justification for the challenged law. States cannot justify restrictive practices merely by citing compelling interests in the abstract; election

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623.1745; fax 206 623.7789

1  regulations must be narrowly tailored to meet specific interests. *See Burdick*, 504 U.S. at 434;

2  *Lerman* v. *Bd. of Elections*, 232 F.3d 136, 149-50 (2d Cir. 2000). The Secretary of State will

3  likely assert that HAVA has compelled the State to adopt RCW 28A.08.107. But this rationale

4  cannot justify the substantial burdens imposed on eligible voters in Washington, since the statute

5  conflicts with HAVA and stands as an obstacle to HAVA's purposes.

6        RCW 29A.08.107 will disenfranchise eligible voters, through no fault of their own. While

7  "[t]he foundation of our 'democratic process' is the right of all qualified voters to cast their votes

8  effectively," "[d]epriving eligible voters of the right to vote . . . shakes that foundation and

9  weakens, rather than supports, the broad goal of preserving the integrity of the electoral process."

10  *Ayers-Schaffner* v. *DiStefano*, 37 F.3d 726, 729 (1st Cir. 1994). It is impossible to "conceive of a

11  governmental interest sufficiently strong to limit the right to vote to only a portion of the qualified

12  electorate." *Id.* at 731. Since RCW 29A.08.107 does just that, it must be invalidated.

13        **C.**    **Even if the Burden Imposed by RCW 29A.08.107 Were Considered**
                 **Less Than Severe, the Statute Could Not Withstand Scrutiny**

14

15        Even if the burden RCW 29A.08.107 imposes on voting rights were considered less than

16  severe, it would not relieve the State of its obligation to offer a justification that outweighs the

17  burden. The assessment of any election regulation requires a *balancing* of the interest of voters

18  against the interests of the state and an evaluation of "the extent to which those interests make it

19  *necessary* to burden the plaintiffs' rights." *Burdick*, 504 U.S. at 434 (emphasis added). The test

20  is a pragmatic one, and "no litmus-paper test . . . separat[es] those restrictions that are valid from

21  those that are invidious." *Storer* v. *Brown*, 415 U.S. 724, 730 (1974).

22        In assessing laws whose burdens on voters are not "severe," courts do not simply apply

23  the deferential "rational basis" test applied to economic legislation. Balancing is still required. As

24  the Fourth Circuit noted, "a regulation which imposes only moderate burdens could well fail the

25  [Supreme Court's] balancing test when the interests that it serves are minor, notwithstanding that

26  the regulation is rational." *McLaughlin* v. *N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th

27  Cir. 1995). *See also New Alliance Party* v. *Hand*, 933 F.2d 1568, 1576 (11th Cir. 1991)

28  ("Although the Court finds that the burden imposed . . . is not insurmountable, the Court

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 21 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1   determines that plaintiffs are due to be granted the relief requested because the interests put forth

2   by the defendant do not adequately justify the restriction imposed."). Regulations that are

3   disproportionate to the nature of the problems addressed will be struck down – especially when

4   they impose unwarranted burdens on vulnerable groups of voters.

5       The onerous burden that RCW 29A.08.107 imposes on Plaintiffs' First and Fourteenth

6   Amendment rights is not justified by any reasonable response to a legitimate concern, much less a

7   narrowly-tailored response to a compelling interest. Accordingly, Plaintiffs have shown a strong

8   likelihood of success on their constitutional claims. In the alternative, Plaintiffs have shown the

9   existence of substantial questions as to these claims. *See Save Our Sonoran*, 408 F.3d at 1120.

10  **III.    Plaintiffs Meet the Other Requirements for a Preliminary Injunction**

11          **A.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction**

12      Plaintiffs and their members seek to exercise a right that the Supreme Court has

13  consistently declared a fundamental right preservative of all rights: the right to vote. *Reynolds*,

14  377 U.S. at 562; *Yick Wo*, 118 U.S. at 370. "Because our democracy was founded on the

15  principle that 'the right to exercise the franchise in a free and unimpaired manner is preservative of

16  other basic civil and political rights,' our courts vehemently protect every citizen's right to vote,

17  carefully and meticulously scrutinizing any alleged infringement." *Charfauros*, 249 F.3d at 951

18  (citation omitted). *See also Wesberry* v. *Sanders*, 376 U.S. 1, 17 (1964).

19      Thousands of eligible Washington voters, including many members of Plaintiffs, will be

20  left off the voting rolls if the Secretary of State enforces the matching provisions of RCW

21  29A.08.107. The violation of a citizen's right to vote is the quintessential case of an injury that

22  should be prevented through injunction. "The loss of First Amendment freedoms, for even

23  minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S.

24  347, 373 (1976) (plurality opinion); *see also Montano v. Suffolk County Legislature*, 268 F.

25  Supp. 2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes

26  irreparable harm.").

27      Plaintiffs will also suffer irreparable injury, distinct from the demonstrated injuries to their

28  members, if this Court does not grant injunctive relief. With each eligible voter denied access to

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 22 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623.1745; fax 206.623.7789

1    the polls, Plaintiffs will suffer great setbacks in achieving their policy goals.  The illegal matching

2    provisions of the Washington statute will frustrate the effort and large investment by Plaintiffs into

3    the cause of increased civic participation and voter registration for under-served communities

4    prior to and leading up to the fall elections.

5          **B.**     **The Balance of Hardships Clearly Falls in Plaintiffs' Favor**

6         Plaintiffs acknowledge that the Secretary of State, and all Washingtonians, have a vested

7    interest in a fair and legitimate election.  By asking this Court to enjoin the Secretary of State

8    from enforcing the matching provisions of RCW 29A.08.107, this interest is not jeopardized.

9    Plaintiffs seek only to ensure that eligible applicants are duly registered to vote even when their

10    information cannot be "matched."  Moreover, Plaintiffs are seeking to prevent a violation of the

11    same federal law (HAVA) that the State purports to be implementing.  The State's only interest

12    here is in following the dictates of federal law.  The parties' interests are therefore aligned.

13         Equitable relief will not impose a substantial cost on the State – indeed, the State has

14    administered all elections to date without disenfranchising non-matching registrants – and there is

15    still enough time before the fall elections to implement an adequate injunction and ensure that

16    voters' rights are preserved.  *Cf. Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d

17    914, 920 (9th Cir. 2003) (en banc) (affirming the denial of a preliminary injunction where

18    plaintiffs sought to enjoin an election when voting had already begun).  Plaintiffs do not seek to

19    impose an additional burden on the State – they simply seek to make sure that the State is

20    complying with HAVA.  "Matching" can and must continue; only the consequence of a failed

21    "match" needs to be changed.  To the extent there will be some minimal cost to the State to

22    eliminate the consequence of a failed "match," that cost is far outweighed by the profound

23    hardship that the lack of an injunction will work on the residents of Washington.  Without an

24    injunction, eligible Washington citizens will be disenfranchised in upcoming elections, with no

25    *post hoc* relief available to cure the damage.

26          **C.**     **The Public Interest Mandates a Grant of Injunctive Relief**

27         The public interest weighs strongly in favor of letting every eligible resident of Washington

28    register and cast a vote.  Protecting an individual's right to vote is "without question in the public

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 23 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206 623 7789

1  interest." *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *see*
2  *also Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) ("Because
3  the right to vote is a fundamental right, removing the undue burdens on that right imposed by the
4  [state regulation] serves the public interest."). By contrast, the Secretary of State's interest in
5  limiting the right of eligible residents to register based on navigating an error-laden bureaucratic
6  procedure frustrates the stated purpose of HAVA to empower citizens to vote free of
7  administrative error. Far from harming the Secretary of State, this request ensures that whatever
8  action the Secretary takes in connection with the upcoming elections will comply with federal law.
9  As those elections approach, and more and more registration applications pour into Washington's
10 39 counties, it is essential to the public interest that the requested injunction be granted and that
11 the Secretary be restrained from processing those applications in a way that violates federal law
12 and unnecessarily disenfranchises Washington residents. The public will not benefit from the
13 imposition of an unnecessary, illegal, and flawed "matching" process that will lead to the most
14 expensive of errors in a democracy – wrongful disenfranchisement – and a loss of public trust.
15      Finally, because the Secretary of State will not suffer material monetary loss as a result of
16 the entry of preliminary injunctive relief, a bond is not required under Fed. R. Civ. P. 65(c).

## CONCLUSION

18      For the foregoing reasons, we respectfully request that the Court enter an order enjoining
19 the Secretary of State from violating Plaintiffs' rights by enforcing RCW 29A.08.107 and refusing
20 to register voters whose identifying information purportedly cannot be "matched."

21
22
23
24
25
26
27
28

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*
*Page 24 of 24*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1    Dated:  May 24, 2006

2                                   HILLIS CLARK MARTIN & PETERSON, P.S.

3                                       /S/ Louis D. Peterson      // Sarah a. Dunne
                                       Louis D. Peterson, WSBA #5776
                                       Sarah A. Dunne, WSBA #34869
4                                      1221 Second Avenue, Suite 500
                                       Seattle, WA 98101-2925
5                                      206-623-1745; 206-623-7789 (fax)
                                       lpd@hcmp.com; sad@hcmp.com
6
                                   *Attorneys for Plaintiffs Washington Association of*
7                                  *Churches, et al.*

8                                  OF COUNSEL:

9                                      PAUL, WEISS, RIFKIND, WHARTON &
                                          GARRISON LLP
10
                                       Robert A. Atkins (*Pro Hac Vice* Pending)
11                                     Evan Norris (*Pro Hac Vice* Pending)
                                       J. Adam Skaggs
12                                     1285 Avenue of the Americas
                                       New York, New York 10019-6064
13                                     (212) 373-3000

14                                     BRENNAN CENTER FOR JUSTICE
                                          AT NYU SCHOOL OF LAW
15
                                       Wendy R. Weiser
16                                     Justin Levitt
                                       161 Avenue of the Americas, 12th Floor
17                                     New York, New York 10013
                                       (212) 998-6730
18

19

20

21

22

23

24

25

26

27

28

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*          HILLIS CLARK MARTIN &
                                                        PETERSON, P.S.

                                                        500 Galland Building, 1221 Second Ave
                                                        Seattle WA 98101-2925
                                                        206 623.1745; fax 206 623.7789

# APPENDIX

RCW 29A.08.107, as amended by 2005 Wash. Legis. Serv. Ch. 246 (S.S.B. 5743) (West), provides as follows:

(1) The secretary of state must review the information provided by each voter registration applicant to ensure that the provided driver's license number, state identification card number, or last four digits of the Social Security number match the information maintained by the Washington department of licensing or the Social Security administration. If a match cannot be made, the secretary of state or county auditor must correspond with the applicant to resolve the discrepancy.

(2) If the applicant fails to respond to any correspondence required in this section to confirm information provided on a voter registration application within forty-five days, the applicant will not be registered to vote. The secretary of state shall forward the application to the appropriate county auditor for document storage.

(3) Only after the secretary of state has confirmed that the provided driver's license number, state identification card number, or last four digits of the applicant's Social Security number match existing records with the Washington department of licensing or the Social Security administration, or determined that the applicant does not have a driver's license number, state identification card number, or Social Security number may the applicant be placed on the official list of registered voters.

(4) In order to prevent duplicate registration records, all complete voter registration applications must be screened against existing voter registration records in the official statewide voter registration list. If a match of an existing record is found in the official list, the record must be updated with the new information provided on the application. If the new information indicates that the voter has changed his or her county of residence, the application must be forwarded to the voter's new county of residence for processing.

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

1    Common Errors and Inconsistencies Affecting the "Match" Process

2    **Data Entry Errors:**

3    • omitting characters (*e.g.*, "THOMAS" becomes "TOMAS" or "JOHN"
4       becomes "JON");

5    • adding characters (*e.g.*, "THOMAS" becomes "THOMMAS," "OWEN"
6       becomes "OWENS");

7    • transposing characters (*e.g.*, "THOMAS" becomes "TOHMAS,"
8       "KREIDLER" becomes "KRIEDLER"); and

9    • substituting characters (*e.g.*, "THOMAS" becomes "TH0MAS" or
10      "THIMAS," "REID" becomes "REED").

11   • omitting fields (*e.g.*, "JAMES THOMAS" becomes "THOMAS");

12   • adding fields (*e.g.*, "JAMES THOMAS" becomes "JAMES J THOMAS" or
13      "MR JAMES THOMAS" or "CAPT JAMES THOMAS");

14   • transposing fields (*e.g.*, "JAMES THOMAS" becomes "THOMAS JAMES",
15      "BAO" "LU" becomes "LU" "BAO");

16   • substituting fields (*e.g.*, "JAMES THOMAS" becomes "JOHN THOMAS");

17   • improperly separating fields – *e.g.*, a hyphenated last name is separated into a
18      middle name and last name ("JAMES" "THOMAS-SMITH" becomes
19      "JAMES" "THOMAS" "SMITH"); and

20   • improperly combining fields, such as the middle (or maiden) and last names
21      (*e.g.*, "MARY" "ANN" "THOMAS" becomes "MARY ANN" "THOMAS",
22      or "GEORGE" "HERBERT" "WALKER" "BUSH" becomes "GEORGE"
         "HERBERT WALKER" "BUSH").

23   **Natural Data Inconsistencies:**

24   • one record contains a nickname and the other contains the full given name
25      (*e.g.*, "SAM" and "SAMUEL," or "LIZ" and "ELIZABETH," would not
         match);

26

27

28

---

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789

- one record contains one spelling of a transliterated foreign name or name using a diacritical mark, the other record contains an alternative spelling, and the matching algorithm does not recognize equivalences (e.g., "MUHAMMAD" and "MOHAMMED" or "WANG" and "HWANG" and "WONG," or "JÜRGEN" and "JUERGEN" or "JURGEN," would not match);

- one record contains punctuation within a name and the other record omits the punctuation (e.g., "O'BRIEN" and O BRIEN" would not match);

- one record contains a woman's maiden name or her husband's name and the other contains her own married name (e.g., "MRS. MARY JONES" and "MRS. MARY SMITH," or "MRS. JOHN SMITH" and "MRS. MARY SMITH," would not match);

- one record contains a woman's maiden name as a compound last name and the other contains her maiden name as a middle name (e.g., "HILLARY" "RODHAM CLINTON" and "HILLARY" "RODHAM" "CLINTON" would not match);

- one record contains a citizen's first initial and middle name and the other contains her first name and middle initial (e.g., "F. SCOTT FITZGERALD" and "FRANCIS S. FITZGERALD" would not match);

- one record contains an original given name and the other contains an "Americanized" given name which the applicant also considers to be official (e.g., "GRACE KIM" and "HYUN KIM" would not match);

- one record contains an individual's name before a religious conversion and the other contains her name after such a conversion (e.g., "MUHAMMAD ALI" and "CASSIUS CLAY" would not match); and

- one record contains a name appropriate at one period in life and the other contains a name appropriate in a different period (e.g., in Burmese, "MAUNG TIN" (for younger men) and "U TIN" (for married men) would not match).

HILLIS CLARK MARTIN & PETERSON, P S

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206 623 1745; fax 206 623 7789

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2006, I electronically filed this *Plaintiffs' Motion for Preliminary Injunction* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

N/A

and I hereby certify that I have sent for service via hand delivered by legal messenger to be served on May 25, 2006 this document to the following non CM/ECF participants:

Sam Reed, Secretary of State, State of Washington
Legislative Building
Olympia, WA 98504-0220

Rob McKenna, Attorney General for the State of Washington
Office of the Attorney General
1125 Washington Street SE
Olympia, WA 98504-0100

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 24th day of May, 2006 at Seattle, Washington.

_/S/ Sarah A. Dunne_    // Sarah A. Dunne
Sarah A. Dunne, WSBA #34869

*Pl. Mot. for Prelim. Injunction (CV 06-0726)*

HILLIS CLARK MARTIN &
PETERSON, P.S.

500 Galland Building, 1221 Second Ave
Seattle WA 98101-2925
206.623.1745; fax 206.623.7789